**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

|  |  |  |
|---|---|---|
| IN RE ALTABA, INC. | ) ) ) | C.A. No. 2020-0413-JTL |

**MEMORANDUM OPINION**

Date Submitted: February 11, 2022
Date Decided: April 18, 2022

Paul J. Lockwood, Arthur R. Bookout, Matthew P. Majarian, Kathryn S. Bartolacci, Gregory P. Ranzini, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; David E. Ross, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; *Attorneys for Petitioner Altaba, Inc.*

Christopher P. Simon, Kevin S. Mann, David G. Holmes, CROSS & SIMON, LLC, Wilmington Delaware; E.F. Anthony Merchant, Q.C., MERCHANT LAW GROUP LLP, Regina, Saskatchewan; *Attorneys for Claimant Emily Larocque.*

**LASTER, V.C.**

Petitioner Altaba, Inc. (the "Company") is a dissolved Delaware corporation. Between 2012 and 2016, hackers victimized the Company repeatedly, resulting in massive data breaches. After the breaches, but before disclosing them, the Company consolidated its operating businesses into a subsidiary named Oath Holdings, Inc., then entered into an agreement to sell Oath Holdings to Verizon Communications Inc. (the "Verizon Sale").

After agreeing to the Verizon Sale, the Company disclosed the data breaches. The disclosures predictably resulted in litigation across multiple jurisdictions. The Company and Verizon renegotiated the Verizon Sale, resulting in the Company agreeing to bear half of any losses from the litigation.

Pertinent to this decision, various plaintiffs filed six putative class action lawsuits against the Company in five different Canadian provinces. Canada lacks any mechanism for consolidating class actions across provinces. Instead, the class actions in different provinces may proceed to judgment, with the court adjusting the remedy in a particular action to avoid duplicative recoveries.

The Company subsequently dissolved and elected to wind up its affairs and make liquidating distributions using the optional, court-supervised process under Sections 280 and 281(a) of the Delaware General Corporation Law (the "Elective Path"). Under the Elective Path, the dissolved corporation "shall petition the Court of Chancery to determine the amount and form of security that will be reasonably likely to be sufficient to provide compensation for any claim against the corporation which is the subject of a pending action, suit or proceeding to which the corporation is a party." 8 *Del. C.* § 280(c)(1).

The Company sent notice of this proceeding to the putative plaintiffs in the six Canadian class actions, and plaintiff's counsel in two of the actions submitted claims (the "Canadian Claims"). The first action, captioned *Karasik v. Yahoo! Inc.*, No. CV-16-566248-00CP, is pending in the Ontario Superior Court of Justice (respectively, the "Ontario Action" and the "Ontario Court"). The second action, *Larocque v. Yahoo! Inc.*, No. QBG-1242, is pending before the Queen's Bench of Saskatchewan (respectively, the "Saskatchewan Action" and the "Saskatchewan Court"). This decision refers to the Ontario Action and the Saskatchewan Action together as the "Canadian Actions."

The Company chose to engage with counsel for the putative class in the Ontario Action ("Ontario Counsel"). Ontario Counsel agreed that the Company need only withhold $50 million as security for the Ontario Action.[1] In this proceeding, the Company sought to rely on that agreement for purposes of making an interim distribution to its stockholders. The court found that the Company had not carried its burden of proof and required the Company to retain security of $800 million on an interim basis. *In re Altaba, Inc. (Interim Security Decision)*, 241 A.3d 768, 782 (Del. Ch. 2020).

---

[1] All dollar figures are in U.S. dollars, not Canadian dollars, unless otherwise specified. The parties used a conversion rate of 1 Canadian dollar ≈ 0.76 U.S dollar in the briefing. The court recognizes that the value of currency fluctuates over time, and the Canadian dollar has strengthened since the parties briefed the issue. Nevertheless, the court has applied the conversion rate used by the parties for purposes of its decision.

The Company, Verizon, and Ontario Counsel subsequently settled the Ontario Action for $15 million. Under the agreement governing the Verizon Sale, the Company was obligated to contribute $7.5 million to fund the settlement.

Under Canadian law, the settlement in the Ontario Action did not automatically dispose of the Saskatchewan Action. The Saskatchewan Court has discretion over whether to permit the Saskatchewan Action to proceed. The defendants in the Saskatchewan Action have asked the Saskatchewan Court to dismiss or permanently stay the Saskatchewan Action in deference to the settled Ontario Action. It has been nearly a year since the defendants made that motion, and the Saskatchewan Court has not yet issued a ruling.

The Company now seeks a final determination that the Company need only retain security of $50 million for the Canadian Claims as a whole. The Company regards its proposal as generous given the approval of the settlement in the Ontario Action. The Company maintains the Saskatchewan Action is duplicative of the Ontario Action and contends that it is reasonably likely that the Saskatchewan Action will be dismissed or permanently stayed in deference to the Ontario Action.

Counsel for the putative class in the Saskatchewan Action ("Saskatchewan Counsel") asks that the Company retain $800 million as security until the final disposition of the Saskatchewan Action. Saskatchewan Counsel regards that amount as a reasonable estimate of the damages that could be awarded to the putative class members in the four provinces where statutes authorize an award of per se damages for breaches of privacy. And while a permanent stay of the Saskatchewan Action may be the most likely outcome, Saskatchewan Counsel correctly points out that it is not the only possible outcome. The

3

Saskatchewan Court has demonstrated a willingness to reject settlements approved in other jurisdictions, and the Saskatchewan Court must follow Saskatchewan legislation on class actions and breaches of privacy. Saskatchewan Counsel correctly points out that if this court only approves security in the amount of $50 million, then it will be impossible for the class to recover the full value of their claims, even if they litigate through trial and prevail on every issue. The court's determination also would affect any settlement negotiations, because rather than facing an admittedly low probability of a massive damages award, the Company's risk would be capped at $50 million. Thus, by approving security in the amount of $50 million, the court would be pre-judging the outcome of the Saskatchewan Action, reducing the value of the Canadian Claims, and affecting the course of litigation before a sister court.

The Company had the burden of providing that the amount of security it proposed was reasonably likely to be sufficient to satisfy the Canadian Claims. The Company proved that the most likely result in the Saskatchewan Action is dismissal or a permanent stay in favor of the Ontario Action, and it is self-evident that in that setting, the Company's proposed amount of security is more than sufficient. That, however, is a different issue than whether the Company's proposed amount of security is reasonably likely to be sufficient to satisfy the Canadian Claims.

The operative test does not call for the court to pick the most likely outcome and set an amount of security based on what would be sufficient in that eventuality. The operative test does not even call for the court to use the risk-adjusted outcome. The test instead calls for the court to assess the range of possible outcomes and determine whether the Company

4

has proven that across those outcomes, the proposed security is reasonably likely to be sufficient.

In this case, the Company failed to carry its burden of proof. There are realistic—albeit low probability—outcomes in which the Company's liability in the Saskatchewan Action would vastly exceed the amount of security that the Company has proposed. In those situations, the claimants in the Canadian Actions would be left holding the bag, and any liquidating distribution that the Company made based on the inadequate security would constitute a windfall for stockholders at the expense of the Company's creditors. Such a result violates the absolute priority rule and results in an improper preference in favor of equity.

The next question is how much security to require. The Company's figure is not persuasive. Saskatchewan Counsel has proposed an amount of security that accounts for known risks and falls within a range of reasonableness, but which will prove excessive unless low probability events arise.

The General Assembly created the Elective Path to enable companies to deal with long-tail risks involving large numbers of claims, where statistical methods would enable a court to determine with some confidence that a form and amount of security was reasonably likely to be sufficient. When setting security for a single claim—even for a single claim in an aggregated class action—the law of large numbers provides no protection. Respect for creditors' rights and the rule of absolute priority requires a conservative approach.

5

The security that Saskatchewan Counsel proposed has a reasoned basis damages figure for claimants in the four provinces that have data security laws that contemplate per se statutory damages. Although the court might have approved a different amount on a different record, the court adopts Saskatchewan Counsel's proposal.

The Company asks that it only be required to maintain the security for the Canadian Claims until the Saskatchewan Court approves the permanent stay—not through final disposition following any appeal. As creditors, the putative class members have priority over the Company's stockholders, who are the residual claimants. In a dissolution process, the court must err on the side of protecting creditors, even when their claims seem unlikely to succeed. The statutory procedure for dissolution contemplates a three-year period for winding up the entity's affairs, with an automatic extension of that period to address pending litigation. Given that timeline, it is not a meaningful hardship for the Company to maintain the $800 million through the final resolution of the Canadian Actions. That outcome will ensure that putative class members may recover amounts to which they are entitled.

The Company will retain a total of $800 million as security, inclusive of the $7.5 million that the Company placed in escrow to fund the settlement in the Ontario Action. The Company will retain this amount of security until a final resolution of the Canadian Actions.

## I.       FACTUAL BACKGROUND

The court conducted a three-day trial to receive evidence regarding the appropriate form and amount of security that the Company would post for a range of claims. The

6

Company and the claimants introduced 990 exhibits into evidence, including twenty-seven deposition transcripts. Four fact witnesses and seven experts testified live. In the pre-trial order, the parties agreed to 250 stipulations of fact.

Only a portion of the record concerned the security for the Canadian Claims, and that portion consisted solely of documents. The record supports the following findings of fact based on a preponderance of the evidence.[2]

## A. The Data Breaches

Between 2012 and 2016, hackers repeatedly victimized the Company, resulting in massive data breaches. The hackers obtained personal account information from the Company's users, including "names, email addresses, telephone numbers, dates of birth, hashed passwords . . . and, in some cases, encrypted or unencrypted security questions and answers." JX 834 at 6.

Under a stock purchase agreement dated July 23, 2016, the Company agreed to sell its operating business to Verizon. JX 7. To facilitate the sale, the Company concurrently entered into a reorganization agreement under which the Company transferred the assets and liabilities associated with its operating business to a newly formed, wholly owned subsidiary, subsequently known as Oath Holdings. *See* JX 6. Under the stock purchase agreement, Verizon agreed to acquire all of the stock of Oath Holdings.

---

[2] Citations in the form "PTO ¶ —" refer to stipulated facts in the pre-trial order. Dkt. 252. Citations in the form "JX — at —" refer to a trial exhibit with the page designated by the internal page number. If a trial exhibit used paragraph numbers, then references are by paragraph.

In September 2016, the Company issued a misleading partial disclosure about the data breaches which stated that the hackers had stolen customers' account information beginning "in late 2014." JX 834 at 3. In November and December 2016, the Company disclosed that additional data breaches occurred in 2013, 2015, and 2016. *In re Altaba, Inc. (National Class Actions Decision)*, 264 A.3d 1138, 1146 (Del. Ch. Oct. 8, 2021). The disclosure of the data breaches prompted a range of lawsuits in multiple jurisdictions, including the six putative class action lawsuits, filed in five different Canadian provinces.[3]

After the Company disclosed the data breaches, Verizon and the Company renegotiated aspects of the stock purchase agreement, and they agreed to share the liability for the Canadian Actions equally. *See* JX 9 § 3(a). The sale of Oath Holdings to Verizon closed in June 2017. PTO ¶ 27.

## B.    The Attempted Mediation

As this court explained in the *Interim Security Decision*, Canada handles class actions differently than the United States:

> Canada does not have an equivalent to the Judicial Panel on Multidistrict Litigation, nor does it have a transfer statute to facilitate the consolidation of cases. Under Canadian law, civil claims (including class action claims) are more often than not determined by a provincial Superior Court, and there is no coordinated "federal" system for class action proceedings. Each province (except Prince Edward Island) has its own separate and distinct class action legislation prescribing the practice and procedures for certifying class

---

[3] In addition to the Ontario Action and the Saskatchewan Action, the other Canadian lawsuits were captioned: *Gill v. Yahoo! Canada*, No. S168873 (Can. B.C. S. Ct.); *Sidhu, et al. v. Yahoo! Canada*, No. 1603-22837 (Can. Alta. Q.B.); *Chami v. Altaba Inc.*, No. CV19-00614734-00CP (Can. Ont. Sup. Ct. J.); and *Boubonniere v. Yahoo! Inc.*, Nos. SMC 500-06-000841-177 & SMC 500-06-000842-175 (Can. Que. Sup. Ct.). PTO ¶ 203.

8

proceedings and carrying them through common issues trials and individual issue resolutions. In Canada, there is no procedural or systemic bar to preclude multiple proposed representative plaintiffs from commencing separate claims in different provinces relating to the same underlying factual circumstances, nor is there a procedural or systemic bar to multiple class actions being certified in multiple jurisdictions in respect of the same underlying facts.

*Interim Security Decision*, 241 A.3d at 779 (cleaned up).

Canada's approach to class actions meant that the Company could not negotiate with a single class representative to obtain global peace. In December 2018, therefore, the Company attempted to hold a mediation with counsel from all six Canadian lawsuits. The lawyers who had filed lawsuits in Ontario, Alberta, and British Columbia formed a consortium to negotiate with the Company. The lawyers who filed in Saskatchewan and Quebec did not join the consortium. They negotiated with the Company separately. The mediation did not result in a settlement. JX 258 ¶ 58.

## C.     The Company Dissolves.

On October 4, 2019, the Company filed a certificate of dissolution with the Secretary of State. The Company chose to wind up its affairs and make liquidating distributions using the Elective Path.

As contemplated by the Elective Path, the Company mailed a notice of dissolution to the Canadian plaintiffs. *See* JX 23. Ontario Counsel and Saskatchewan Counsel submitted claims in response. *See* PTO ¶¶ 207–08; JX 210; JX 214.

On January 14, 2020, the Company engaged in a follow-on mediation with Ontario Counsel. The subject of the mediation was the amount of security that the Company should retain for the Ontario Action. When the mediation took place, Ontario Counsel did not have

9

any special authority to negotiate on behalf of a class. The Company and Ontario Counsel agreed that the Company should retain $50 million as security for any liability the Company might face in the Ontario Action. *See* JX 258 ¶ 72.

Saskatchewan Counsel was not invited to participate in the follow-on mediation. The Company has argued that it did not engage with Saskatchewan Counsel because they did not have authority to represent a class, but at that point, Ontario Counsel did not either.

### D. The Representation Order In The Ontario Action

To obtain retroactive authority for Ontario Counsel's agreement to the $50 million figure, Ontario Counsel asked the Ontario Court to issue a pre-certification representation order authorizing them to address the amount of security. On March 3, 2020, the Ontario Court issued the order. JX 222.

On May 8, 2020, Saskatchewan Counsel asked the Saskatchewan Court to issue a pre-certification representation order giving them authority comparable to the Ontario Court's order. JX 223. The Saskatchewan Court has not ruled on the motion.

### E. The Ontario Settlement

On July 6, 2020, the Company and Ontario Counsel reached a settlement. JX 228 Sched. 1 (the "Ontario Settlement"). In return for an aggregate settlement consideration of $15 million, Ontario Counsel granted the defendants in the Ontario Action a global release covering all of the Canadian Claims. *See id.* § 2.1. The Ontario Settlement allows class members to waive their share of the settlement consideration and receive at least one year of free credit monitoring services. *Id.* § 5.1. The Company and Verizon each paid $7.5 million to fund the Ontario Settlement. *See* Dkt. 24, Decl. of Thomas J. McInerney ¶ 9.

10

The Ontario Settlement binds all members of a nationwide class who do not opt out. The effectiveness of the settlement, however, was conditioned on both final approval from the Ontario Court and the dismissal or permanent stay of the Saskatchewan Action (the "Permanent Stay Condition"). Ontario Settlement §§ 14.1; 15.1. The defendants in the Ontario Action (the "Ontario Defendants") can waive the Permanent Stay Condition in their sole discretion. *Id.* § 14.3.

After agreeing to the Ontario Settlement, Ontario Counsel moved in the Ontario Action for an order certifying a class for settlement purposes only. *See* JX 228 ¶¶ 1, 23. Saskatchewan Counsel intervened in the Ontario Action to oppose the motion for class certification, arguing that the Ontario Court should wait until the Saskatchewan Court had ruled on Saskatchewan Counsel's request for a representation order and until this court determined the amount of security for the Canadian Claims. JX 228 ¶ 27.

Saskatchewan Counsel also contended that the Ontario Settlement provided inadequate consideration to the class. Saskatchewan Counsel asserted that the Ontario Settlement was especially inadequate for class members who lived in Saskatchewan, British Columbia, Manitoba, and Newfoundland and Labrador, because those four provinces each have privacy statutes that impose per se damages for breaches of privacy. *Id.* ¶ 29.

On August 26, 2020, the Ontario Court certified a class for settlement purposes. *Id.* ¶¶ 47, 50–51. The Ontario Court noted that because Saskatchewan Counsel believed class treatment was appropriate for the Saskatchewan Action, the only viable argument they could make against class treatment for the Ontario Action was their request that the court

11

defer its ruling. The Ontario Court rejected that argument, finding it "indisputable that an action certified for settlement purposes is preferable to an uncertified and vigorously contested action in another jurisdiction." *Id.* ¶ 39. The Ontario Court noted that Saskatchewan Counsel was free to object to the Ontario Settlement. In addition, because the Ontario Settlement was conditioned on a dismissal or stay of the Saskatchewan Action, Saskatchewan Counsel could oppose the Company's efforts in the Saskatchewan Action to satisfy the Permanent Stay Condition. *Id.* ¶¶ 40–41.

## F.     The Interim Security Decision

On August 20, 2020, the Company sought leave from this court to make an interim distribution. Relying on its agreement with Ontario Counsel, the Company argued that a reserve of $50 million was adequate security for the Canadian Claims. *Interim Security Decision*, 241 A.3d at 780.

Saskatchewan Counsel asked the court to require the Company to hold back $800 million "at least until additional rulings are received from the Canadian Courts." *Id.* at 781. To calculate the value of the claims in the Saskatchewan Action, Saskatchewan Counsel presented the following evidence:

- Four Canadian provinces—British Columbia, Saskatchewan, Manitoba, and Newfoundland—have privacy legislation that creates actions in tort for breach of privacy without proof of damages. Claimants in these four provinces thus can seek damages and other relief, including per se damages, even if they cannot prove actual losses. Ontario does not have analogous privacy legislation, meaning that the plaintiffs in the Ontario Action cannot seek per se damages.

- Together, those four Canadian provinces have a combined population that represents 21% of the total population of Canada. The Company has estimated that the Canadian class as a whole would consist of around five million members. Assuming that approximately 21% of those members live in either

12

British Columbia, Saskatchewan, Manitoba, or Newfoundland, then 1.05 million class members could be entitled to per se damages.

- Canadian courts have awarded per se damages for privacy violations between $1,000 (CAD) and $3,500 (CAD).

- Based on those awards, the recovery for the class members living in British Columbia, Saskatchewan, Manitoba, or Newfoundland could range from $1.05 billion (CAD) to $3.68 billion (CAD), or $800 million to $2.8 billion. And that figure does not take into account the damages that members residing in one of Canada's other provinces potentially could prove.

*Id.* at 780–81.

Citing the complex issues created by the dueling Canadian Actions, the court declined to "hazard a guess about what will happen in the Canadian Actions" for purposes of the interim distribution. *Id.* at 782. Instead, the court found that "[t]he risk of undervaluing the Canadian Claims . . . outweighs the Board's interest in providing additional value to the stockholders immediately, particularly given that more information about the Canadian Actions will become available soon." *Id.* The court therefore ordered the Company to reserve $800 million as security for the Canadian Claims when making the interim distribution.

**G.     The Ontario Court Approves The Ontario Settlement.**

Meanwhile, Ontario Counsel asked the Saskatchewan Court to stay the Saskatchewan Action until the Ontario Court had ruled on the Ontario Settlement. JX 258 ¶ 81. The Saskatchewan Court granted the stay. *Id.* ¶ 82.

On December 21, 2020, Saskatchewan Counsel filed objections to the Ontario Settlement. JX 245. Saskatchewan Counsel argued principally that the settlement

consideration was inadequate because of the availability of per se damages under privacy statutes in Saskatchewan and other provinces. JX 245 ¶¶ 24–25.

On February 9, 2021, the Ontario Court approved the Ontario Settlement. JX 258 ¶ 13. In a detailed opinion, the Ontario Court considered and rejected the argument that Saskatchewan Counsel could obtain "a better outcome for the class," characterizing it as resting on "pure speculation and unverifiable belief." *Id.* ¶ 151. The Ontario Court described taking a "deep dive into the case law about privacy breach class actions" and concluded that the cases would not support Saskatchewan Counsel's "aspirations for enormous per capita awards of general damages (moral or symbolic damages) for intrusion on seclusion or breach of privacy statutes." *Id.* ¶¶ 125, 140.

By approving the Ontario Settlement, the Ontario Court did not purport to decide the fate of the Saskatchewan Action. The Ontario Court noted that a motion for approval of a settlement is not "a trial about the likelihood of whether another class action will be certified, nor is it about the likelihood that if certified that rival action would provide more access to justice and a better outcome for the Class Members." *Id.* ¶ 11. The Ontario Court acknowledged that it is conceivable that Saskatchewan Counsel "could achieve a better outcome but that is not the issue before the court." *Id.* The Ontario Court further explained that "[w]hether another court will enforce the judgment of the Ontario [C]ourt or allow a rival class to proceed are issues for that court, not this one." *Id.*

The approval of the Ontario Settlement thus did not determine the outcome of the Saskatchewan Action. Moreover, because of the Permanent Stay Condition, the approval of the Ontario Settlement did not even determine the outcome of the Ontario Action.

14

On April 30, 2021, the Saskatchewan Court heard oral argument on the Company's motion for a permanent stay in favor of the Ontario Action. Dkt. 288 at 2. The Saskatchewan Court indicated that it would decide the motion in due course. *Id.* The Saskatchewan Court has not yet ruled.

## H. Trial On The Amount Of Security For The Canadian Claims

At trial in this action, the Company sought to prove that a reserve of $50 million would provide adequate security for the Canadian Claims. Saskatchewan Counsel argued that the Company should be required to maintain $800 million as security until the final resolution of the Canadian Actions. The parties introduced documentary evidence on the issue. On July 20, 2021, the court heard post-trial argument.

On October 15, 2021, the court issued an order staying proceedings as to the Canadian Claims for ninety days. *In re Altaba, Inc.*, 2021 WL 4863102 (Del. Ch. Oct. 15, 2021). The court explained that it was granting the stay to permit the Saskatchewan Court to rule on the Company's motion for a permanent stay in favor of the Ontario Action. *Id.* ¶ 24.

The stay expired on January 13, 2022. The Saskatchewan Court has not yet ruled on the fate of the Saskatchewan Action, nor has the Saskatchewan Court provided any indication of when it plans to rule. The parties submitted letters regarding the implications of the stay's expiration in which neither side objected to the issuing of a ruling. The Company affirmatively requested a ruling.

15

## II.    LEGAL ANALYSIS

The question for decision is the amount of security that is reasonably likely to provide sufficient compensation for the Canadian Claims. The Company had the burden of proving that its proposed security meets the requisite standard. *National Class Actions Decision*, 264 A.3d at 1144.

The Company failed to carry its burden of proof. Although the Company's proposed security likely would be sufficient in many scenarios, including in the most likely scenario, there are reasonably likely outcomes in which the reserve would be woefully insufficient. Using the Company's proposed amount would prejudge the outcome of the Saskatchewan Action by limiting the recovery that Saskatchewan Counsel could achieve, even in scenarios where the class prevailed completely at trial. By capping the potential recovery, such a ruling also would dramatically reduce the settlement value of the claims.

The alternative is Saskatchewan Counsel's request for a reserve of $800 million. That amount is likely to be excessive in many scenarios, but it is reasonably likely to provide sufficient security across a wider range of outcomes, including scenarios in which Saskatchewan Counsel achieves a meaningful recovery on the Canadian Claims.

This decision requires that the Company retain $800 million as security for the Canadian Claims, inclusive of the $7.5 million that the Company already has placed in

16

escrow for its share of the Ontario Settlement. The Company will retain that amount until

the final disposition of the Canadian Actions, including the resolution of any appeals.[4]

---

[4] In its briefing, the Company revived an argument that failed at an earlier stage of the case. The Company asserts that Emily Larocque, the putative plaintiff in the Saskatchewan Action, lacks standing to object to the Company's proposed security because Larocque and Saskatchewan Counsel have not been granted authority to represent a Canadian class. The Company argues that to have authority to object, Saskatchewan Counsel must represent a certified class or have received a representation order from a Canadian court. The Company's argument misunderstands Saskatchewan Counsel's involvement in the case. They have appeared on behalf of a claimant in response to a notice received from the Company, and they are objecting to the amount of security that the Company sought to prove sufficient for the Canadian Claims.

Section 280 does not require that a claimant have the authority to represent a class before the claimant may appear as an objector. The Company has the burden of proving the amount of security. Section 280(c)(1) does not limit the parties who can object. The Company gave notice to Larocque, and Saskatchewan Counsel appeared in response.

Policy considerations support this result. Claimants "need to participate in the Section 280 procedures when a corporation elects to proceed pursuant to that section to ensure that their claims are addressed in the dissolution process." R. Franklin Balotti & Jesse A. Finkelstein, 1 *The Delaware Law of Corporations and Business Organizations* § 10.18, at 10-57 (4th ed. & Supp. 2021-2). If a claimant cannot participate, then there is a risk that the court would set security too low, prejudicing the claimant's interests. A claimant in a putative class should not have to await class certification or a representation order before filing an objection.

The Company's current concerns about unauthorized representatives are a recent invention. When the Company convened a mediation to negotiate a global resolution involving all six of the putative class actions filed in the Canadian provincial courts, no class had been certified for any purpose in any province, and none of the plaintiffs had received a representation order. The Company went forward with the mediation. When the Company mailed notices of dissolution to potential claimants, including the plaintiffs in all six of the putative class actions filed in Canada, no class had been certified in any province for any purpose, and none of the counsel had received a representation order. If no one had responded, the Company doubtless would have relied on that fact to argue that no security was required for the Canadian Claims. The Company then turned to Ontario Counsel to negotiate over the amount of security for this proceeding. At the time, no class had been

17

## A.     The Legal Standard

Section 280(c)(1) requires that the court "determine the amount and form of security that will be reasonably likely to be sufficient to provide compensation" for any claim that is "the subject of a pending action, suit or proceeding to which the corporation is a party" (a "Litigation Claim"). 8 *Del. C.* § 280(c)(1). Under this test, the Company bore the burden of proving that its proposed amount of security is "reasonably likely to be sufficient" (the "Reasonableness Standard"). *See National Class Actions Decision*, 264 A.3d at 1162.

In the *National Class Actions Decision*, this court ruled on the plain meaning of the Reasonableness Standard. That standard starts with the concept of sufficiency. Black's Law Dictionary defines "sufficient" to mean "[a]dequate; of such quality, number, force, or value as is necessary for a given purpose." *Sufficient*, Black's Law Dictionary (11th ed. 2019). The Reasonableness Standard thus looks to whether the amount of security is adequate to provide compensation for the claimant.

---

certified in the Ontario Action, and Ontario Counsel did not have authority to act under a representation order. It was only after agreeing to an amount of security that Ontario Counsel obtained a representation order. Having sought to benefit from its interactions with putative class representatives and counsel who were similarly situated to Saskatchewan Counsel, the Company should not now be heard to object to their participation in this proceeding.

It also bears noting that by appearing in this case, Saskatchewan Counsel has provided the court with the benefits of an adversarial presentation on an important issue. In their absence, the court could have appointed an *amicus curiae* or guardian *ad litem* to facilitate adversarial briefing. Saskatchewan Counsel saved the court the trouble.

Importantly, however, the Reasonableness Standard does not require an amount of security that "will be sufficient." *Cf.* 8 *Del. C.* § 280(c)(2). The Reasonableness Standard calls for an amount of security that is "reasonably likely to be sufficient," thereby qualifying the concept of sufficiency with the adverbial phrase "reasonably likely."

Something is "likely" to occur if it is more probable than not to occur. *See, e.g.*, *Likely*, Black's Law Dictionary (11th ed. 2019) ( "[a]pparently true or real; probable" or "[s]howing a strong tendency; reasonably expected"). The Reasonableness Standard thus calls for an amount of security that generally will be sufficient across the possible outcomes of a Litigation Claim.

The Reasonableness Standard takes the additional step of modifying the adverb "likely" with the adverb "reasonably." In this context, the additional adverb has two functions. First, it emphasizes the importance of judicial judgment.[5] The court is not bound to set security at the result that is 51% probable. The court can move to one side of the distributional curve or the other, if the facts warrant. *See National Class Actions Decision*, 264 A.3d at 1164–65. Second, the adverb makes clear that the court must make an objective

---

[5] *See, e.g., AB Stable VII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *91 (Del. Ch. Nov. 30, 2020) (explaining that the use of the qualifier "reasonable" results in a "somewhat lesser standard" than a flat contractual requirement (quoting ABA Mergers & Acqs. Comm., *Model Stock Purchase Agreement with Commentary* 212 (2d ed. 2010))), *aff'd* 268 A.3d 198 (Del. 2021); *see also Reasonable*, Black's Law Dictionary (11th ed. 2019) ( "[f]air, proper, or moderate under the circumstances").

19

determination, as in what "a reasonable person would believe," rather than deferring to the good faith judgment of the liquidating agent. *Id.* at 1164 n.19.[6]

The Reasonableness Standard does not call for picking the single most likely outcome and setting security at that amount. The standard also does not call for setting security at the risk-adjusted value of the Litigation Claim. Instead, the Reasonableness Standard requires that the court evaluate the potential outcomes, then set security in an amount that is reasonably likely to be sufficient to compensate the claimants. As experienced Delaware practitioners have explained, the framing of the Reasonableness Standard "suggests that security for pending litigation claims will ordinarily be the full amount of the claim, absent a finding (probably on a basis similar to summary judgment, and not binding in the other forum in any event) that judgment will not exceed some lower amount." Lawrence A. Hamermesh & Donald J. Wolfe, *The Delaware Dissolution Statutes: A Case Study*, Del. Law., Fall 1994, at 24. "[T]his court is not *required* to set an amount of security that guarantees that a plaintiff will have available the full amount of any judgment that the plaintiff could achieve in a pending lawsuit." *National Class Actions*

---

[6] *See In re RegO Co.*, 623 A.2d 92, 109 (Del. Ch. 1992) (explaining that "due respect for the expertise and authority of corporate directors does not dictate deference to their judgment on the question of what constitutes adequate protections to various competing classes of claimants on dissolution"); *Boesky Corp. v. CX P'rs, L.P.*, 1988 WL 42250, at *16 (Del. Ch. Apr. 28, 1988) ("a liquidating trustee's judgment as to what constitutes adequate security, even when made in good faith and advisedly is not entitled to the powerful effects of the business judgment rule; and that in such a setting, it is inescapably the function of the court that supervises the liquidation to make an independent judgment of the adequacy of such security when it is challenged").

*Decision*, 264 A.3d at 1175; *see In re Swisher Hygiene, Inc.*, 2020 WL 3125415, *4 (Del. Ch. June 12, 2020). But that outcome often will be the amount necessary to protect the interests of creditors.

As discussed at length in the *National Class Actions Decision*, the structure of Delaware's dissolution regime and related policy considerations inform the court's analysis. Delaware's dissolution statute obligates a dissolved corporation to use its assets to satisfy creditors before distributing "any remaining assets" to stockholders. 8 *Del. C.* § 278. That mandate reflects the absolute priority rule. As residual claimants, stockholders must stand at the back of the line, await the results of the winding up process, and receive what remains after creditors' claims have been paid. *See National Class Actions Decision*, 264 A.3d at 1153–56.

The Elective Path enables a corporation to obtain upfront judicial determinations regarding the amounts of security that are required for creditors' claims before making a liquidating distribution. Under the Elective Path, "[r]ather than having the sufficiency of the security potentially decided long after the fact, with the benefit of hindsight, and at a time when subsequent events would have revealed the reserve to be inadequate, the question of sufficiency can be litigated up front." *Id.* at 1157.

By facilitating an upfront judicial determination, the Elective Path does not eliminate the difficulties inherent in setting an amount of security. It just changes the decisionmaker who must make them. The risk remains that the reserve will turn out to be insufficient. If stockholders receive a liquidating distribution based on an inadequate reserve, then those stockholders have received a distribution to which they were not

21

entitled, contravening the rule of absolute priority. *See id.* at 1158. Respect for the absolute priority rule calls for a conservative approach to security that protects the interests of creditors.

A conservative approach is also warranted when a court sets the amount of security, because that determination has at least two effects on the pending claim. First, once the Company makes a liquidating distribution, the available security caps the amount that the claimant can recover, even if the claimant prevails on every aspect of its claim. The inadequate reserve impairs the claimant's rights.

Second, because the amount of the reserve caps the claimant's potential recovery, the parties will update their assessments of the claim. Those updated assessments in turn reduce the settlement value of the claim.

It is easy to perceive this second effect by envisioning three stylized distribution curves:



In each case, assume that the court sets the amount of security at one of the measures of central tendency, such as the mean, so as to reflect the reasonably likely outcome. By doing

so, the court eliminates the ability of the claimant to recover the greater amounts awarded in any scenarios to the right of the mean. With the right tail of the curve eliminated, the claim now only generates left-tailed results. Cutting off the right side of the distribution reduces the area under the curve and resets the expected value of the claim.

With the distributions on the right side of the curve no longer achievable, the parties update their assessments. A defendant will no longer settle for the expected value reflected by the previous mean. Any new settlement will take into account the capped upside, reducing the settlement value to the plaintiff and benefitting the defendant.

Because of these effects, setting security using a metric like the risk-adjusted value of the claim or its value in the most likely scenario threatens to systematically under-compensate creditors while conferring windfalls on equity. Even if this court gets the probability distribution exactly right, the act of setting security changes the expected value of the claim and causes the litigants to update their assessments. By doing so, the court affects the course of a litigation proceeding before a sister court. Rather than the sister court presiding over the claim and determining its fate, this court puts its thumb on the scales.

These risks operate most powerfully where, as here, a court sets a reserve for a single claim. When a court sets an aggregate reserve for many similar claims, the law of large numbers comes into play. Some claims will generate recoveries below their risk-adjusted outcomes; others will generate recoveries above their risk-adjusted outcomes. As the number of claims increases, the outcomes balance out and approach the weighted average. *See generally* David H. Kaye & David A. Freedman, *Reference Guide on Statistics*, *in*

23

*Annotated Reference Manual on Scientific Evidence* 117–21 & n.117 (2d ed. Michael J. Saks et al. eds., 2005).

When a court sets an aggregate reserve across a large number of claims, using a risk-adjusted outcome does not pose a serious risk of undercompensating claimants and conferring a windfall on equity. By contrast, the task of setting a reserve for a single claim accentuates those risks. And that is particularly true in a right skewed distribution, where many litigation outcomes will generate comparatively limited recoveries, but where there are significant—albeit lower probability—outcomes that generate large recoveries. Recognizing this reality, this court has erred on the side of providing meaningful security for claimants, even where when their claims seemed unlikely to succeed. *See In re Delta Hldgs., Inc.*, 2004 WL 1752857, at *7–9 (Del. Ch. July 26, 2004); *Boesky*, 1988 WL 42250, at *16–17.

## B.     The Possible Outcomes In The Canadian Actions

With the foregoing principles in mind, the court must consider the range of possible outcomes in the Canadian Actions to determine whether the Company has carried its burden of proving that $50 million in security satisfies the Reasonableness Standard. There are three basic scenarios: the Dismissal Scenario, the Waiver Scenario, and the Parallel Litigation Scenario.

### 1.     The Dismissal Scenario

In the Dismissal Scenario, the Saskatchewan Action ends. Under the Dismissal Scenario, the Company's proposed security of $50 million is more than sufficient.

The Dismissal Scenario arises if the Saskatchewan Court dismisses or permanently stays the Saskatchewan Action. The parties' experts agree that "it is reasonably likely that the [Saskatchewan Action] will be permanently stayed by the Saskatchewan Court." JX 259 ¶ 5. The court concurs that this outcome is the most likely result.

A decision by the Saskatchewan Court that dismisses or permanently stays the Saskatchewan Action is not the end of the line, because Saskatchewan Counsel could appeal. A reversal, however, would be unlikely. By statute, the Saskatchewan Court has "wide discretion in determining [whether a class action] will proceed." JX 257 ¶ 16. If the Court of Appeal for Saskatchewan affirms the permanent stay or dismissal of the Saskatchewan Action, then that is the end of the Canadian Claims.

Under the Dismissal Scenario, the Company's proposed security is more than sufficient. That is the reasonably likely outcome. It is even the most likely outcome. But as this decision has discussed, identifying the reasonably likely (or most likely) outcome does not mean that the court should set security at the value the claim would have in that state of the world. The Reasonableness Standard asks whether the security provided will be reasonably likely to compensate the claimant across all potential outcomes, not whether it will be reasonably likely to compensate the claimant under the odds-on outcome.

## 2. The Waiver Scenario

In the Waiver Scenario, the Saskatchewan Action moves forward, but the Ontario Action does not. Under the Waiver Scenario, the Company's proposed security of $50 million is not reasonably likely to be sufficient.

The Waiver Scenario could arise if the Saskatchewan Court does not dismiss or permanently stay the Saskatchewan Action. It also could arise if the Saskatchewan Court grants the dismissal or permanent stay, but the Court of Appeal reverses the Saskatchewan Court's decision.

In that setting, the litigation in the Ontario Action also could continue because the Permanent Stay Condition would not be met. The Ontario Defendants, however, can achieve finality in the Ontario Action by waiving the Permanent Stay Condition. With the only outstanding condition waived, the Ontario Settlement would bring the Ontario Action to an end.

The Waiver Scenario assumes that the Ontario Defendants waive the Permanent Stay Condition, ending the Ontario Action. Only the Saskatchewan Action moves forward to discovery, trial, and either a final judgment or settlement.

Although the court regards the Waiver Scenario as unlikely, it could produce results in which the Company's proposed security would be inadequate. Either an adverse judgment or a further settlement could lead to those results.

### a. The Risk Of An Adverse Judgment

One outcome potential outcome under the Waiver Scenario is for the Saskatchewan Action to proceed through trial and produce a final judgment. If that occurs, then the magnitude of the Company's liability could be significant. As this court previously explained, "the recovery for the class members living in British Columbia, Saskatchewan, Manitoba, or Newfoundland could range from . . . $800 million to $2.8 billion in U.S. dollars. And that figure does not take into account the damages that members residing in

26

one of Canada's other provinces potentially could prove." *Interim Security Decision*, 241 A.3d at 781 (cleaned up). That figure also does not take into account the possibility of actual damages for breach of privacy, which can encompass emotional distress, inconvenience, disruption due to risks of loss of personal information, or "other actual loss." JX 257 ¶ 33.

For purposes of the Reasonableness Standard, however, it is not enough to simply recognize that adverse results of this magnitude are possible. The court must assess the likelihood of those results occurring. For present purposes, rather than attempting to assign a probability outcome to the adverse results, it is easier to estimate how unlikely those results would have to be before the Company's proposed security would be adequate.

Assume that the judgment in the Saskatchewan Action is the only source of liability for the Canadian Claims and that $7.5 million of the Company's security has been used to fund the Ontario Settlement, leaving $42.5 million for the Saskatchewan Action. Recall that the Company only faces liability for 50% of the Canadian Claims, because Verizon must fund the other 50%.

The low-end estimate of $800 million makes the Company potentially liable for $400 million. Using that figure, the Company's proposed security is only sufficient if Saskatchewan Counsel has less than a 10.6% chance of success.[7] Viewed conversely, the Company's proposed security is only sufficient if the defendants in the Saskatchewan

---

[7] ($42.5 million / $400 million).

Action have at least an 89.4% chance of success. If the defendants have an 85% chance of success—overwhelming odds in any litigation—then the $50 million in security is insufficient.

It is unlikely that Saskatchewan Counsel could convince the Saskatchewan Court to move forward and then proceed to trial and obtain a result of $800 million. But the Company has not demonstrated that Saskatchewan Counsel has less than an 11% chance of success. Viewed from this standpoint, the Company's proposed security is inadequate in the low-end case.

The high-end estimate of $2.8 billion makes the Company potentially liable for $1.4 billion. Using that figure, the Company's proposed security is only sufficient if Saskatchewan Counsel has less than a 3% chance of success.[8] Viewed conversely, the Company's proposed security is only sufficient if the defendants in the Saskatchewan Action have at least a 97% chance of success.

Just as it is unlikely that Saskatchewan Counsel could proceed to trial and obtain the low-end result, it is unlikelier still that Saskatchewan Counsel could obtain the high-end result. But the Company has not demonstrated that Saskatchewan Counsel has less than a 3% chance of success. Viewed from this standpoint, the Company's proposed security is inadequate in the high-end case.

---

[8] ($42.5 million / $1.4 billion).

### b.    The Risk Of A Larger Settlement

Another possibility in the Waiver Scenario is a new settlement. The Company has set aside $50 million as security for the Canadian Claims, including $7.5 million to fund the Ontario Settlement. In the Waiver Scenario, the Ontario Settlement brings the Ontario Action to a close, leaving $42.5 million available to fund a settlement in the Saskatchewan Action. The Saskatchewan Action continues, but rather than proceeding to trial, the defendants reach a settlement with Saskatchewan Counsel.

By definition, a settlement involves compromise, so it seems safe to assume that any settlement in the Saskatchewan Action would come in well below the Company's $400 million share of a low-end result. Beyond that, it is difficult to predict where the parties would end up. Here again, however, it is possible to calculate that in any settlement in which Saskatchewan Counsel obtained 10.6% or more of the Company's share of the low-end damages demand, the Company's security would be inadequate.[9] Parties often settle for cents on the dollar, but it is difficult to say in the abstract that Saskatchewan Counsel could never achieve more than 11 cents on the dollar in a settlement. At levels of 11 cents on the dollar or higher, the Company's proposed security is inadequate.

### 3.    The Parallel Litigation Scenario

A final possibility is the Parallel Litigation Scenario, in which both the Saskatchewan Action and the Ontario Action move forward. Under the Parallel Litigation

---

[9] ($42.5 million / $400 million).

29

Scenario, the Company's proposed security of $50 million is not reasonably likely to be sufficient.

Like the Waiver Scenario, the Parallel Litigation Scenario arises only if (i) the Saskatchewan Court does not dismiss or permanently stay the Saskatchewan Action or (ii) the Saskatchewan Court grants the dismissal or permanent stay, but the Court of Appeal for Saskatchewan reverses the Saskatchewan Court's decision. Then, for the Parallel Litigation Scenario to occur, the Ontario Defendants must opt not to waive the Permanent Stay Condition. It seems unlikely that the Ontario Defendants would stand on the condition and walk away from the Ontario Settlement, but in the abstract, the Ontario Defendants might believe rationally that they could extract a better settlement by forcing the plaintiffs' lawyers to invest in the case, or by demonstrating through discovery that the Ontario Defendants' case was particularly strong. The Parallel Litigation Scenario is thus less likely than the unlikely Waiver Scenario, but it remains a possible path.

In the Parallel Litigation Scenario, the Company engages in parallel litigation in Ontario and Saskatchewan. The Saskatchewan Action moves forward for the obvious reason that it has not been dismissed or permanently stayed. In addition, the litigation in the Ontario Action resumes, because the Permanent Stay Condition failed and the Ontario Defendants did not waive it. The plaintiffs in the Ontario Action therefore can move forward as well. Both actions proceed to discovery, both actions head to trial, and both actions end in a judgment or a new settlement.

The analysis of the possible outcomes in the Waiver Scenario applies to the Parallel Litigation Scenario, except (i) there is greater potential for damages because the Ontario

Action has not been resolved, (ii) there is greater volatility in the range of possible results because there are two actions proceeding in two courts, and (iii) the full $50 million security is available because of the non-consummation of the Ontario Settlement.

The analysis of the Waiver Scenario showed that the Company's proposed security was inadequate if Saskatchewan Counsel settled for 11 cents or more on the dollar. Any award of additional damages in the Ontario Action would only make it more likely that the Company's proposed $50 million security would be inadequate. The Parallel Litigation Scenario therefore only heightens the risk that the Company's proposed security will not be sufficient to cover the Canadian Claims.

The Parallel Litigation Scenario could result in a new global settlement for which the entire $50 million would be available. Because the potential damages are greater in this scenario, the calculations again make it more likely that the Company's proposed $50 million security is inadequate.

## C. Assessing Whether The Company's Security Is Reasonably Likely To Be Sufficient

The Company contends that its proposed security is reasonably likely to be sufficient to satisfy the Canadian Claims because a stay of the Saskatchewan Action is the most likely outcome. To reiterate, the court agrees as to the most likely outcome in the Saskatchewan Action. The modal outcome is thus that the Canadian Actions will end, and the Company's security will be adequate. But that is a different analysis than whether the Company's security is reasonably likely to be sufficient.

31

As this decision has discussed, the Reasonableness Standard does not obligate the court to pick a measure of central tendency, set the amount of security based on that measure, and ignore the tail risks. Doing so threatens to undercompensate legitimate creditors and confer an improper preference on stockholders, violating the absolute priority rule. The Canadian Claims present a prototypical example. The distribution of outcomes is skewed right, meaning that in most scenarios, the Company's proposed security will be adequate, but there are reasonably likely scenarios in which the Company's proposed security would cover only a small fraction of the creditors' claims.

The Company bore the burden of proving that its proposed amount of security is reasonably likely to be sufficient. The Company proved that it is highly likely to prevail in the Saskatchewan Action. The Company did not prove that it has a better than 89.4% chance of prevailing in the Saskatchewan Action, which is what the Company would have to show for the court to have confidence that its proposed amount of security is adequate.

As discussed in the *National Class Actions Decision*, the Reasonableness Standard "permits the court to move further away from the right side of the curve" when setting an amount of security. 264 A.3d at 1164–65. The Company almost certainly could have convinced the court that some discount from $800 million was warranted. The Company might well have convinced the court that a meaningful discount was warranted. Instead, the Company asked the court to move almost all the way to the left side of the curve and view the Saskatchewan Action as having less than an 11% chance of success. The Company did not make a sufficiently persuasive case to obtain that result.

32

**D.      The Amount Of Security**

The Company failed to carry its burden of proving that its proposed security meets the Reasonableness Standard. This court must therefore set an amount of security. The only other figure in the record is the proposal of $800 million in security from Saskatchewan Counsel.

This court has acknowledged that the statutory mandate for the Court of Chancery to "determine the amount and form of security" resembles the mandate in the appraisal statute that the court "determine the fair value of the shares." *Compare* 8 *Del. C.* § 262(h), *with id.* § 280(h); *see National Class Actions Decision*, 264 A.3d at 1175. Because of that parallel, the court looked by analogy to how the Delaware Supreme Court has instructed the court regarding valuation determinations under the appraisal statute. *National Class Actions Decision*, 264 A.3d at 1175. For example, the Delaware Supreme Court has explained that "the Court of Chancery has discretion to select one of the parties' valuation models as its general framework or to fashion its own." *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 525–26 (Del. 1999). The Delaware Supreme Court also has explained that the Court of Chancery may "adopt any one expert's model, methodology, and mathematical calculations, *in toto*, if that valuation is supported by credible evidence and withstands a critical judicial analysis on the record." *Id.* at 526. Or the court "may evaluate the valuation opinions submitted by the parties, select the most representative analysis, and then make appropriate adjustments to the resulting valuation." Jesse A. Finkelstein & John D. Hendershot, *Appraisal Rights in Mergers and Consolidations*, Corp. Prac. Series (BNA) No. 38-5th, at A-31 (2010 & Supp. 2017) (collecting cases). The exercise ultimately is, at

33

bottom, "a fact-finding exercise." *In re Appraisal of Jarden Corp.*, 2019 WL 3244085, at *1 (Del. Ch. July 19, 2019), *aff'd sub nom. Fir Tree Value Master Fund, LP v. Jarden Corp.*, 236 A.3d 313 (Del. 2020).

In its discretion, this court adopts Saskatchewan Counsel's assessment of the amount of security that will be sufficient for the Canadian Claims. The reserve of $800 million is based on a reasonable estimate of the damages that could be awarded to the 1.05 million residents of the four Canadian provinces with legislation permitting per se damages for privacy violations. Because the Company and Verizon agreed to split liability, a reserve of $800 million implies a total estimate of $1.6 billion in potential damages. This estimate would result in an award of around $1,524 per claimant,[10] or $2,000 (CAD). Saskatchewan Counsel cited precedents which show that such an award is well within the potential range of damages.

Under Canadian common law, plaintiffs are not required to prove actual loss to receive nominal or symbolic damages. *See* Dkt. 188 at 13; JX 257 ¶¶ 29–31. Canadian courts may award nominal damages "to recognize that [plaintiffs'] rights have been invaded or interfered with by breach of contract or other legally actionable wrong by the defendant." JX 257 ¶ 30. Canadian courts may award symbolic damages "for actionable misconduct by a defendant that contravenes public laws, such as privacy legislation." *Id.* ¶ 31.

---

[10] ($1.6 billion / 1.05 million residents)

Both forms of damages could be available in the Saskatchewan Action. The Canadian law concerning monetary remedies in privacy class actions remains in a nascent stage. As the Ontario Court explained, "although many [of these] cases have been certified, none have yet proceeded to trial." JX 258 ¶ 125. Due to the absence of trial-level class action decisions, Saskatchewan Counsel looked to existing jurisprudence on individual privacy claims for guidance. Saskatchewan Counsel presented recent Canadian case law where individual claimants recovered nominal damages of between $1,000 (CAD) to $3,500 (CAD).[11] *See* Dkt. 188 at 11–13 & nn.14–16 (collecting authorities).

Using these damages estimates, the recovery for the 1.05 million putative class members living in British Columbia, Saskatchewan, Manitoba, or Newfoundland could range from $800 million to $2.8 billion, or $1.05 billion (CAD) to $3.68 billion (CAD). A reserve of $1.05 billion (CAD) would imply a total estimate of $2.10 billion (CAD) for damages (50% to be funded by the Company and 50% to be funded by Verizon), which would result in a nominal damages award of $2,000 (CAD) per claimant.[12]

---

[11] The Company observes that the expert proffered by Saskatchewan Counsel, Paul Joseph Bates, opined that the "sum which may be awarded for nominal damages varies from a low of $1 to $250 or more." JX 257 at ¶ 30. That figure of $250 (CAD) that Bates selected is obviously below $1,000 (CAD). At the same time, Bates technically said "$250 or more," and he cautioned that "[t]here is very little Canadian jurisprudence concerning the proper quantum of nominal damages in Canadian law." *Id.* Saskatchewan Counsel provided examples of recent outcomes awarding more than $250 (CAD) in nominal damages.

[12] ($2.10 billion / 1.05 million putative class members)

Based on these figures, Saskatchewan Counsel has proposed a reasonable amount of security. In most future states of the world, the amount will be more than sufficient. Yet the amount does not guarantee the full amount that the Canadian Claims could yield in the Waiver Scenario or the Parallel Litigation Scenario. Unlike the Company's figure, the amount that Saskatchewan Counsel has proposed represents a persuasive effort to account for the potential outcomes on the Canadian Claims, and the court adopts it.

## E.    How Long To Hold The Security

The Company argues that if the court requires security in the amount of $800 million, then the Company should be permitted to release the reserve if the Saskatchewan Court grants the pending motion for dismissal or a permanent stay. The Company asserts that it should not have to maintain a reserve through any appeal, because an appeal is unlikely to succeed due to a deferential standard of review. *See* JX 256 ¶ 114–18.

Given the court's confidence that any decision issued by the Saskatchewan Court will be well-reasoned, and in light of the deferential standard of review that would apply on appeal, it is highly unlikely that an appeal of a permanent stay would succeed. But the outcome of an appeal is impossible to predict, particularly an appeal involving foreign law. The better course is for the Company to retain the $800 million security until the final disposition of the Canadian Actions, including any appeals.

The court recognizes that this decision will force the Company to maintain the $800 million reserve for an additional period of time. But even if it takes another year or two to resolve the fate of the Canadian Actions, that time period would not be excessive. The Delaware General Corporation Law contemplates a three-year winding-up process by

default, and the statute provides for automatic extensions of a corporation's existence for purposes of resolving claims that were pending at the time of dissolution or filed during the three-year period. 8 *Del. C.* § 278. Under the absolute priority rule, stockholders must wait to avoid prejudicing the rights of creditors.

## III. CONCLUSION

The Company failed to carry its burden of proving that its proposed security of $50 million for the Canadian Claims satisfies the Reasonableness Standard. The Company shall reserve $800 million for the Canadian Claims, inclusive of the $7.5 million that the Company placed in escrow for its share of the Ontario Settlement. The Company shall maintain the reserve until the final resolution of the Canadian Actions.